```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DAVID GOLDSTEIN,
```

|                                         |                              |
|-----------------------------------------|------------------------------|
| Plaintiffs,                             | **MEMORANDUM & ORDER**       |
| - against -                             | No. 06 CV 6707 (ERK)(VVP)    |

```
ALLEN S. GOLD and LAW OFFICES OF ALLEN
S. GOLD,
                    Defendants.
-----------------------------------------------------------------X
```

KORMAN, *J*.:

Plaintiff David Goldstein alleges five state law claims for relief against his former attorney, defendant Allen Gold, stemming from defendant's representation of plaintiff in insurance litigation against Mass Mutual Life Insurance Company ("Mass Mutual"). Defendant counterclaims for attorney's fees allegedly owed to him by plaintiff. Defendant now moves for summary judgment on all of plaintiff's claims and the parties cross-move for summary judgment on defendant's counterclaim. Jurisdiction is proper pursuant to 28 U.S.C. § 1332(a).

## **Factual Background**

In February 1993, plaintiff was injured in an automobile accident, which rendered him incapable of continuing his work as a chiropractor. (Niehaus Aff., Ex. A, Compl. ¶¶ 9, 10.) In August 1994, plaintiff's orthopedist placed him on total disability and, by the end of 1994, Mass Mutual, plaintiff's disability insurance carrier, began to pay plaintiff a monthly disability stipend. (*Id*. ¶ 10.) As a condition of receiving disbursements under the disability insurance policy, Mass Mutual required plaintiff to undergo monthly medical checkups. (*Id*. ¶ 12.) In 1998, an independent physician appointed by Mass Mutual declared that plaintiff was "totally disabled from the practice of chiropractic." (Compl. ¶ 11.) Mass Mutual, however, continued to require

plaintiff to submit "doctor-certified" monthly progress reports and delayed disability payments because of plaintiff's refusal to submit to monthly checkups. (Compl. ¶ 13.) Plaintiff subsequently developed Generalized Anxiety Disorder, allegedly rooted in his fear that Mass Mutual would refuse to disburse payments under the insurance policy as a result of the monthly checkups. (Compl. ¶ 14.)

In July 1999, plaintiff retained defendant to represent him in an action against Mass Mutual in New York State Supreme Court ("1999 action"). (*See* Def.'s Aff., Ex. A, Retainer Agreement, dated July 20, 2009.) Plaintiff sought a declaratory judgment that the requirement in his disability policy that he submit monthly reports to Mass Mutual be deemed waived by Mass Mutual. (Pl.'s Aff., Ex. A, *Goldstein v. Mass. Mutual Ins. Co*., No. 113804/99, Decision and Order (N.Y. Sup. Ct. May 3, 2000).) The Supreme Court dismissed the complaint, holding that plaintiff's injuries did not meet the "presumptively disabled" definition contained in the disability insurance policy, but noted that "defendant [Mass Mutual] has agreed to accept yearly physician's reports rather than monthly reports at this time." (*Id.* at 2.)

Despite this alleged agreement, Mass Mutual continued to require plaintiff to submit to "frequent" physician's examinations and "threaten[ed] to cut off [his] disability payments." (Pl.'s Aff. ¶ 5.) Thus, in the "fall or early winter of 2000," plaintiff alleges that he "instructed [defendant] Mr. Gold to again sue MassMutual both to force MassMutual to abide by its agreement to seek only annual medical 'updates,' and for damages relating to the mental trauma MassMutual was knowingly inflicting upon [plaintiff] through its abusive harassment." (*Id*. ¶ 7.) Plaintiff further alleges that, in early 2001, defendant informed him that he filed a complaint against Mass Mutual ("2001 action"), "seeking the relief [plaintiff] had requested." (*Id*. ¶ 8). This was not true – defendant never filed the 2001 action. (*Id*. ¶ 9.) Nevertheless, from 2001 to

2

2005, in response to plaintiff's repeated inquires as to the status of the 2001 action (*id*. ¶¶ 10-12), defendant led plaintiff to believe that he was vigorously litigating the 2001 action against Mass Mutual (*id*. ¶¶ 8, 13-22).

Although defendant denies telling plaintiff that he filed a lawsuit in 2001 (Niehaus Aff., Ex. B, Answer ¶ 22), the record does not support this assertion. Indeed, between November 2, 2001, and August 6, 2006, plaintiff sent defendant at least twenty-three emails and letters that referenced the 2001 action. (*See* Pl.'s Aff. Exs. B–U, W, Z, AA.) It is clear from this correspondence that plaintiff believed defendant had not simply filed the 2001 action but was aggressively litigating it on his behalf. (*See, e.g.*, *id*., Ex. E, letter, dated February 24, 2002 ("What is your legal opinion on how [Mass Mutual's] response to your serving them with the order to show cause will impact my '3 part lawsuit' commenced against them?"); *id*., Ex. F, letter, dated March 27, 2002 ("is there any additional information on the status (date) for the 'Preliminary Conference' for the 3-part lawsuit that you commenced on my behalf?"); *id*., Ex. N, letter, dated December 27, 2003 ("thank god the court has ordered a January 20, 2004 status conference; with the intent being; as I understand it; to get this case on a tight schedule in order to bring it to completion.").) Plaintiff alleges that "at no point did Mr. Gold ever state that no lawsuit had been filed" (Pl.'s Aff. ¶ 26), nor did he "ever question what lawsuit [plaintiff] was referring to in any of the above correspondence" (Pl.'s Aff. ¶ 27). On the contrary, plaintiff "specifically recall[s defendant] informing [him] that he had engaged in extensive discovery with MassMutual" (*id*. ¶ 16), "that MassMutual was engaged in delaying tactics to slow the case down" (*id*. ¶ 17), "that he had responded to numerous sets of interrogatories propounded by MassMutual" (*id*. ¶ 18), "that a 'Preliminary Conference' had been scheduled . . . for July 23,

3

2002" (*id*. ¶ 20), and "that a 'Status Conference' had been scheduled . . . for January 20, 2004" (*id*. ¶ 21).

Moreover, defendant billed plaintiff for time he spent reading plaintiff's correspondence and speaking with plaintiff regarding his inquires as to the 2001 action. For example, defendant's time sheets (Constantine Aff., Ex. D) reflect that, on November 5, 2001, defendant spoke with plaintiff regarding plaintiff's letter, dated November 2, 2001, in which plaintiff wrote that "[he] would like to discuss the status of my case since you have filed those 3 new lawsuits." (Pl.'s Aff., Ex. B.) Similarly, defendant's time sheets (Constantine Aff., Ex. D) reflect that on December 24, 2001, defendant reviewed an email he received from plaintiff in which plaintiff wrote that "[i]t would be a huge help to my health and well being to know if Mass. Mutual has responded or not. I believe they had to December 15, 2001. . . . I would also like to request that I review all of their Discovery requests" (Pl.'s Aff. Ex. C). Defendant's time sheets are replete with similar entries. More significantly, there is no evidence in the record that defendant ever informed plaintiff that there were no "new lawsuits" filed against Mass Mutual in 2001.

Under the parties' Retainer Agreement, plaintiff agreed to pay defendant an initial retainer payment of $2,500, and once "the initial retainer is depleted or comes within $500.00 of depletion as a result of hours charged, [plaintiff] agree[d] to replenish his . . . account by payment of an interim retainer in the amount of $2,500.00." (Retainer Agreement.) The interim retainer was to be replenished once depleted or within $500 of depletion. (*Id*.) A February 20, 2002 letter from plaintiff to defendant makes clear that plaintiff "replenished" the retainer based on his belief that defendant was working on the 2001 action.

> After Mass. Mutual responded to the suit, I had asked you about the status of my retainer. You had explained to me that they would be sending you a list of discovery issues and when you saw how much work would be involved you would ask for a replenishment at that time. Being that they have delayed sending

4

> you any discovery issues, in addition to apparently breaching my contract I wanted to know if now would be a good time to mail you another check. When we last spoke last week you had said you would need additional funds soon.

(Pl.'s Aff. Ex. D.) Defendant's billing time sheets indicate that, the next day, he spoke to plaintiff regarding the letter and that plaintiff would send money to defendant. (Constantine Aff., Ex. D.) On February 25, 2002, defendant acknowledged receipt of plaintiff's "check in the amount of $5,000 as a retainer replenishment." (Pl.'s Aff., Ex. JJ.) Moreover, between January 12, 2001 and July 14, 2004 – during which time plaintiff believed defendant was litigating the 2001 action – plaintiff paid defendant at least $25,000 in legal fees. (*Id*.)

In September 2004, plaintiff, believing that the 2001 action "appear[ed] to be heading toward its[] final innings," requested that defendant send him "a copy of the actual complaint that you have filed on my behalf." (*Id*., Ex. Q.) On October 29, 2004, defendant sent plaintiff signed copies of an amended summons and verified amended complaint, dated November 3, 2003. (*Id*., Ex. BB.) But neither document bore an index number because defendant never brought the 2001 action. (*Id*., Ex. S ("My [plaintiff's] complaint copy doesn't have an index number on it.").) Without the index number, plaintiff was unable to find a record of the 2001 action on the New York State Unified Court System's website. (*Id*.) At some point, defendant told plaintiff that the index number for the 2001 action was 100545/01 and plaintiff then asked defendant "to send [him] a copy of the pre-amended version of the complaint (index #100545/2001) with all numbers, dates, [and] stamps" from the clerk's office. Defendant, however, could not produce such a document. (*Id*., Ex. T.) Indeed, plaintiff "specifically recall[s defendant] informing [him] that" he would be unable to "find the Purported 2001 Action on the New York State Court System's website because it had been 'sealed,' and assigned a new index number." (Pl.'s Aff. ¶ 23.) When plaintiff again asked for a copy of the complaint as-

5

filed, defendant replied in an email, stating, "[u]nfortunately, when I asked the clerks, they laughed at me. I would be lucky to get something from them that happened 5 minutes ago, much less 5 years." (*Id*., Ex. V.)

On February 1, 2005, four years after he was supposed to file the 2001 action, defendant actually did file a second suit against Mass Mutual in New York Supreme Court, Queens County ("2005 action"). (*Id*. ¶ 30, Ex. FF.) As drafted by defendant, the 2005 complaint alleged 6 causes of action: the first sought the exact same declaratory relief that the Supreme Court had denied in the 1999 action; the second was for fraud; and the remaining claims – claims 3 through 6 – sounded in tort. (*Id*., Ex. FF.) The Supreme Court held that the first claim was barred by *res judicata* and the remaining claims were barred by the statute of limitations. (*Id*., Ex. GG, *Goldstein v. Mass. Mutual Life Ins. Co.*, No. 2515/05, Short Form Order (N.Y. Sup. Ct. Aug, 22, 2005).). As to the tort claims, which had a three year statute of limitations, the Supreme Court found that plaintiff had "not alleged any facts or actions taking place subsequent to 1998," that he "only [had] until the end of 2001 to interpose the[ tort] claims" against Mass Mutual, and that "[p]laintiff did not interpose these claims until February 1, 2005." (*Id*.)

The dismissal of the 2005 action "shocked" plaintiff, particularly the Supreme Court's findings "regarding my not 'interposing' claims three through six b[y] the end of 2001", because he believed that defendant had "interposed" these claims in the 2001 action. (*Id*., Ex. T.) Indeed, plaintiff was so convinced that the Supreme Court had erred in finding his tort claims time-barred that he decided to appeal the decision. (*See id*., Ex. HH.) In an email to defendant on December 7, 2005, shortly before defendant filed the appeal, plaintiff wrote: "I am sure the appellate guy you met with on Monday had the opportunity to realize that [the Supreme Court Justice']s finding that I had not "'interpos[ed]' claims three through six b[y] the end of 2001

6

w[as] outright [i]ncorrect." (*Id*., Ex. T (emphasis in original).) Plaintiff believed that all the documents defendant told him he had filed in the 2001 action were "sit[ting] within the 'sealed 100545/01' part" of the file for the 2005 action. (*Id*.)

Defendant never disabused plaintiff of these views. On the contrary, in response to plaintiff's numerous requests for a "copy of the originally filed, 'interposed' . . . claims that [the Supreme Court Justice] has apparently not had an opportunity to read" (*id*., Ex. T; *see also id*., Exs. U, W, X, Z), defendant fabricated documents and provided them to plaintiff as evidence that he had filed the 2001 action. (Pl.'s Aff. ¶¶ 28a-d.) Indeed, defendant produced a summons and verified complaint, dated February 12, 2001, which bore no index number (*id*., Ex. CC); a check, dated February 1, 2001, made out to the Queens County Clerk (*id*., Ex. DD); and an unsigned Notice of Deposition and Verified Answer, both dated April 27, 2001 and bearing the Index No. 10054/01, which defendant represented had been filed and served by Mass Mutual's counsel, Michael Yoeli of the law firm Assail & Yoeli, LLP (*id*., Ex. EE).

Defendant's fabrication of the Notice of Deposition and Verified Answer was particularly brazen and, as it turns out, ill-conceived. Indeed, at his deposition Mr. Yoeli testified that he never represented Mass Mutual in a case bearing index number 10054/01, never represented Mass Mutual "in an action brought by David Goldstein during the year 2001," and was never "served with a summons and/or verified complaint in or about February of 2001 with a lawsuit entitled Goldstein versus Massachusetts Mutual." (Niehaus Aff., Ex. H, Yoeli Dep. 6, 17.) Moreover, with respect to the Notice of Deposition and Verified Answer, Mr. Yoeli testified that "on April 27th, 2001 when th[ese are] dated, the law firm of Assail & Yoeli was no longer in existence . . . . So this could not have been a document issued by me or my firm." (Yoeli Dep 20; *id*. 21.)

While these fabrications convinced plaintiff of the merits of his appeal, they, for obvious reasons, had no effect on plaintiff's appeal. Indeed, on September 12, 2006, the Appellate Division affirmed the decision of the Supreme Court dismissing all of plaintiff's claims against Mass Mutual. (Pl.'s Aff., Ex. II, *Goldstein v. Massachusetts Mutual Life Insurance Co.*, No. 2005-0923, Decision & Order (2nd Dep't Sept. 12, 2006).)

Shortly thereafter, in December 2006, plaintiff brought this diversity action against defendant, alleging fraud, attorney malpractice, breach of contract, attorney misconduct under New York Judiciary Law § 487, and intentional infliction of emotional distress. (Compl. ¶¶ 63–88.) Defendant counterclaimed for attorney's fees allegedly owed him by plaintiff. (Countercl. ¶¶ 8–9.) As initially pled, defendant sought $30,826.28 in attorney's fees. He has since reduced that amount to $23,784.61. This $7,041.67 reduction reflects defendant's decision to "forgo the amount [he] charged [plaintiff] for reading the textbooks and articles" that plaintiff sent him during the course of the representation. (Def.'s Mem. at 2.)

Defendant now moves for summary judgment on his counterclaim for attorney's fees and on all of plaintiff's claims. Plaintiff opposes defendant's motion for summary judgment on his 5 causes of action and cross-moves for summary judgment on defendant's counterclaim for outstanding attorney's fees.

**Discussion**

Each of plaintiff's claims – for fraud, attorney malpractice, breach of contract, attorney misconduct under New York Judiciary Law § 487 and intentional infliction of emotional distress – is based on defendant's alleged failure to file the 2001 action and his continued misrepresentation that he had not only filed the action but was vigorously litigating it. Moreover, defendant concedes that "[t]here is no doubt that the counterclaim [for attorney's fees]

8

arises under the same circumstances and facts that form the basis for the Plaintiff's claims." (Niehaus Aff., Ex. F, at 5.) Defendant does not contest plaintiff's allegations that he failed to file the 2001 action or that he "deceived [plaintiff] about commencing an action in 2001. . . ." (Def.'s Reply Mem. at 5.) Instead, he argues that plaintiff's claims fail, because "plaintiff simply cannot establish damages" (Def. Mem. 2), and that he entitled to summary judgment on his counterclaim, because "plaintiff's account was in arrears at the time of his termination" (Def.'s Reply Mem. at 2).

As to the fraud, breach of contract, attorney misconduct and intentional infliction of emotional distress claims, defendant argues merely that it is "indisputable" that plaintiff cannot establish damages. (Def.'s Mem. at 2.) Defendant, however, does not offer any evidence nor point to a single material fact that supports this "indisputable" conclusion. The facts material to plaintiff's alleged damages are (1) whether he "paid [defendant] tens of thousands of dollars based on [defendant]'s false representation that the money was paying for an ongoing litigation [the 2001 action]" (Pl.'s Opp'n Mem. 8); (2) whether the 2005 action was dismissed as untimely due to defendant's failure to interpose the tort claims by the end of 2001 (Pl.'s Aff., Ex. GG); and (3) whether plaintiff "suffer[ed] severe-mental trauma as a result of [defendant]'s deliberate and knowing actions in . . . fraudulently leading [him] to believe that the MassMutual situation was being addressed" (Pl.'s Opp'n Mem. at 9).

As the moving party, defendant bears the burden of identifying evidence that "demonstrate[s] the absence of a genuine issue" as to each of these "material fact[s]." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); Fed. R. Civ. P. 56(c). "If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then 'summary judgment must be denied *even if no opposing evidentiary matter is presented*.'"

*Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (emphasis in original). "[T]he non-movant is not required to rebut an insufficient showing." *Giannullo v. City of New York*, 322 F.3d 139, 141 (2d Cir. 2003). Thus, only if the moving party carries its burden of production, must the adverse party "'set forth specific facts showing there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Relying on his affidavit (Def.'s Aff.) and billing time sheets (Constantine Aff., Ex. D), defendant argues that "[t]he simple fact is that Plaintiff was not over billed . . . [and] did not pay 'tens of thousands of dollars' as a result of a fraud." (Def.'s Reply Mem. at 6.) On this point, defendant merely argues that a "majority of the billable hours between 2001 and 2005" – when plaintiff alleges he believed defendant was litigating the 2001 action – "were for conversations had between plaintiff and [defendant], [defendant] contacting Mass Mutual when plaintiff['s] disability checks were late, [and] reviewing letters and articles sent to him by plaintiff." (*Id.*)

Passing over the fact that defendant does not allege that his time records were recorded contemporaneously and, consequently, may be less reliable than those which are so recorded, defendant's mere assertion that he did not bill plaintiff for time spent litigating an action that he never filed, is not sufficient to shift the burden of production to plaintiff here. *Giannullo*, 322 F.3d at 141. Nevertheless, plaintiff has produced more than sufficient evidence from which a reasonable juror could conclude that defendant falsely represented that the fees he incurred between 2001 and 2005 were for work performed in furtherance of the 2001 action and that plaintiff paid him thousands of dollars based on this representation. (*See, e.g.*, Pl.'s Aff., Exs. B–U, W, Z, AA (plaintiff's correspondence referencing the 2001 action).) For example, on February 20, 2002, plaintiff wrote, "After Mass. Mutual responded to the suit, I had asked you about the status of my retainer . . . When . . . we spoke last week you had said you would need

additional funds soon." (*Id*., Ex. D.) A few days later, defendant acknowledged receipt of plaintiff's "check in the amount of $5,000 as a retainer replenishment." (*Id*., Ex. JJ.) Moreover, as discussed above, between early 2001 and mid-2004, plaintiff paid defendant at least $25,000 in legal fees under the impression that he was paying for fees incurred litigating the 2001 action. (*Id*.; *see also id*. ¶ 41 ("It was [plaintiff's] understanding . . . that [plaintiff's] funds were paying for [defendant]'s services in connection with the Purported 2001 Action.").) The circumstances of these payments are strong evidence that plaintiff suffered monetary damages as a result of defendant's conduct.

Moreover, defendant presents no evidence to contradict plaintiff's allegation that his failure to bring the 2001 action "resulted in the dismissal of the suit finally filed in 2005 on statute of limitations grounds." (Pl.'s Opp'n Mem. at 9.) Nor does he address plaintiff's allegations that plaintiff paid him approximately $15,000 to prosecute the unsuccessful appeal of the 2005 action. (Pl.'s Aff. ¶ 33; *id*., Exs. II, JJ.) Notwithstanding defendant's arguments to the contrary, it is beyond dispute that the New York Supreme Court dismissed the tort claims interposed in the 2005 action as untimely because defendant failed to allege on plaintiff's behalf any actions by Mass Mutual within the applicable statute of limitations. (*Id*., Ex. GG (holding that the tort claims are "barred by the applicable statutes of limitations.").) A reasonable juror could determine that this failure damaged plaintiff in at least two ways: First, it permitted defendant to charge plaintiff "significant additional legal bills" for bringing the 2005 action and subsequent appeal (Pl.'s Opp'n Mem. at 9), which may have been unnecessary had defendant filed the 2001 action. Second, it denied plaintiff an opportunity to litigate the merits of his tort claims because the Supreme Court dismissed them on procedural grounds (Pl.'s Aff., Ex. GG) and this holding was affirmed on appeal by the Appellate Division (*id*., Ex. II).

The foregoing is sufficient to dispose of defendant's motion for summary judgment with respect to plaintiff's fraud, breach of contract, attorney misconduct and intentional infliction of emotional distress claims. As to the attorney malpractice claim, defendant argues that his alleged conduct did not cause any damage to plaintiff because plaintiff's claims against Mass Mutual were futile. (Def.'s Reply Mem. at 4.). Nevertheless, because the attorney malpractice claim, as well as defendant's counterclaim for attorney's fees, arise out of the same nucleus of fact as those claims for which defendant's motion for summary judgment is denied, it is not necessary to reach the merits of the parties' arguments regarding these remaining claims and counterclaims. As the Second Circuit has observed:

> [T]here seems no question that in the long run fragmentary disposal of what is essentially one matter is unfortunate not merely for the waste of time and expense caused the parties and the courts, but because of the mischance of differing dispositions of what is essentially a single controlling issue.

*Audi Vision Inc. v. RCA Mfg. Co.*, 136 F.2d 621, 625 (2d Cir. 1943). Indeed, "[i]f one of a number of integrally related causes of action have to be tried, it makes no sense to grant summary judgment as to one or more of them, as it may prove necessary to hold yet another trial in the event that it is determined on appeal that summary judgment was improperly granted." *Manzi v. DiCarlo*, 62 F. Supp. 2d 780, 793 (E.D.N.Y. 1999) (relying on *Audi Vision*).

## Conclusion

Defendant's motion for summary judgment on plaintiff's claims and his counterclaim is denied. Plaintiff's cross-motion for summary judgment on the counterclaim is also denied.

SO ORDERED.

Brooklyn, New York
September 1, 2009

*Edward R. Korman*
Edward R. Korman
United States District Judge